## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JOHN MYERS,                                    :

      Plaintiff,                          :

  vs.                                          :

CAROLYN COLVIN,                                :
Acting Commissioner of the Social
Security Administration,                       :

      Defendant.                          :

Case No. 3:12cv00192

District Judge Walter Herbert Rice
Chief Magistrate Judge Sharon L. Ovington

## REPORT AND RECOMMENDATIONS[1]

### I.  <u>Introduction</u>

Plaintiff John Myers has been a maintenance worker, a construction worker, a forklift operator, and a concrete batch operator. He has also been attempting, since late 2003, to convince the Social Security Administration that he is under a disability and is consequently eligible to receive Disability Insurance Benefits and Supplemental Security Income. Myers' asserted disability involves severe and ongoing back pain and other health problems. On two different occasions, an Administrative Law Judge – first, ALJ Daniel R. Shell; more recently, ALJ Amelia G. Lombardo – denied Myers' applications based on the

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

conclusion that he is not under a benefits-qualifying disability.[2]

Myers brings the present case challenging ALJ Lombardo's non-disability decision on the grounds that she erred (1) by finding Myers was not credible, and (2) by rejecting the opinion of Myers' treating physician, Dr. Venable.

Myers seeks an Order reversing ALJ Lombardo's decision and remanding this case for payment of disability benefits. He emphasizes that this matter is more than eight years old. The Commissioner seeks an Order affirming ALJ Lombardo's nondisability decision.

This Court has jurisdiction to review ALJ Lombardo's decision as it constitutes the Social Security Administration's final denial of Myers' DIB and SSI applications. *See* 42 U.S.C. §§405(g), 1383(c)(3).

## II.    **"Disability" Defined**

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). A "disability" consists only of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70.

---

[2] This Court previously remanded Myers' first case in light of the parties' Joint Motion for Remand. *John Myers v. Comm'r of Social Sec.*, 3:09cv00168 (S.D. Ohio)(Rice, D.J.; Merz, M.J.).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

## III.    Background

### A.    Meyers' Vocational Profile and Testimony

Myers was 40 years old on his alleged disability onset date – October 3, 2003. He is therefore in the age category of a "younger individual" under Social Security regulations. 20 C.F.R. §§404.1563(c); 416.963(c).[3] He has a high school education obtained through a GED.

Myers was continually employed from at least 1986 until October 3, 2003, at times performing a job that required him to lift nearly 100 pounds (e.g, stacking cement bags). (Tr. 82-89, 334). He explained to the Social Security Administration, in his Work History Report, "My last job ... was for the Montgomery County Public Works. I had great benefits & good pay. I loved my job, unfortunately my back did not...." (Tr. 89).

During an administrative hearing in December 2006 (before ALJ Shell), Myers testified that he underwent back surgery in 1986 and again 1991. (Tr. 336). He was able to return to work but his condition "just got progressively worse." *Id*. He explained, "I was having a lot of problems with my legs, especially my back, my left leg. It just got to where I ... literally couldn't get out of bed. I mean, there were days when I couldn't put any weight

---

[3] The remaining citations will identify the pertinent DIB regulations with full knowledge of the corresponding SSI regulations.

on my left leg." *Id*. He also testified that he has circulation problems in both legs and that his sciatic nerve mainly causes problems in his left leg. (Tr. 337). When his pain in most severe, he is only capable of lying on his back. (Tr. 340). When his pain is at the lowest level, he watches television and walks around to loosen up his back. (Tr. 340-41).

In response to a question about his work-affecting impairments, Myers testified:

> I, just my back and my legs, I just, there's some days I can't hardly get out of bed. The days that I do, it's just basically going from the couch, maybe walk around a little bit. I'm just so sore all the time and my medications that I take, I can be sitting there one minute, I get real tired a lot of time.

(Tr. 337). Myers had been obtaining treatment from his family physician, Dr. Venable, since 1987. *Id*.

In August 2011, Myers testified during a second administrative hearing, which was held by ALJ Lombardo. Myers was asked about the level of his pain the zero-to-10 pain scale – zero equaling no pain; 10 equaling pain severe enough to send him to a hospital. Myers stated that his typical pain level was 7 or 8. (Tr. 551). He put his most severe back pain at 10. With this much pain, he cannot do anything except lie flat on his back. *Id*. On other days when his back pain is less severe, it is still a 7 or 8 on the pain scale. The lowest level of pain is 5 or 6. But this occurs only 2 to 3 days per week. (Tr. 550-51).

During ALJ Lombardo's hearing in August 2011, she questioned Myers about whether he lived in West Virginia. Myers testified that he did not live in West Virginia but sometimes visited his wife there. He also stated was separated from his wife. (Tr. 541, 548). He explained, "I'm there with my wife just for my doctor visits. I don't live with her. She

4

has her one bedroom apartment and I go there for my visits. That's the only way I can get to a doctor. And with her coverage the way it is, I have to see my doctor there." (Tr. 548). Myers further testified that he lives in Piqua, Ohio with his mother-in-law. (Tr. 550).

Myers testified that he had worked for 13 years after his back surgery in 1990. After 13 years, "scar tissue built up and arthritis and everything, it just got – it just got to me." (Tr. 545). When asked, "What is the problem exactly," Myers answered:

> I, honestly, I go to bed at night feeling like I got a knife in my back and a rope around my leg. I just – my circulation in my leg, my feet go numb. Actually my feet are always numb, but I get this real, real, deep, deep ache and that's where I can't sleep at night. I get two, sometimes three hours of sleep. That's on a good night. And usually about the third night's when I usually fall out and get four hours. I nap a lot during the day.

(Tr. 546). Medication takes the edge off, and he uses a TENS (transcutaneous electrical nerve stimulation) unit. (Tr. 546-47). He can sometimes walk one block but sometimes he cannot. He explained that if he lies around too much or moves around to much, he gets "stiff and sore." (Tr. 548). He added, "'[I]t really depends upon my day. I do try to walk a little bit to keep – just to do something, I guess." *Id.*

Myers can stand for one-half hour before he wants to sit to relieve his left leg. He can sometimes sit between 45 minutes and an hour but needs to stand and stretch because he gets muscle spasms that extend into the center of his back. He can normally lift a gallon of milk but no more. He further testified, "I lifted a gallon of milk before and threw my back out. It's just – I have to really watch what I'm doing. I've coughed and sneezed and thrown my back out. It's just kinda crazy." (Tr. 549).

5

**B.**     **Medical Opinions**

**1.**

**Treating Physicians**

Walter Venable, M.D. began treating Myers in 1987. In February 2006, Dr. Venable wrote a letter stating, in part, that Myers' diagnoses include chronic low back pain secondary to degenerative disc disease and major depression with prominent anxiety and insomnia. (Tr. 227). Dr. Venable further wrote, "In regards to his prognosis, I believe he will continue to experience severe low back pain for the foreseeable future and will require long-term use of narcotic analgesics. As a result of his functional limitations I believe he will continue to suffer from depression and anxiety and will require medications for this as well." *Id.*

Dr. Venable also answered Interrogatories in February 2006.  He reported that Myers had marked decrease in range of motion and muscle spasm in the lumbosacral region of his back. (Tr. 228). As to Myers' work abilities, Dr. Venable opined that (1) Myers could not frequently lift and carry any weight but could occasionally lift and carry 5 pounds; (2) he could stand and walk less than 1 hour during an 8-hour workday; and (3) he could sit for 2 hours during an 8-hour workday; he could never climb, balance, stoop, crouch, kneel, or crawl. (Tr. 229-30). Dr. Venable believed that it would be hazardous for Myers to work at heights "due to limited physical capability to balance. Extreme cold would likely increase his inflexibility and vibration[,] especially sudden[,] would likely exacerbate his symptoms." (Tr. 231). Dr. Venable added, "Mr. Myers['] physical capability has been observed and documented during numerous visits since the time of his initial injury. I do not believe he could tolerate even sedentary employme[nt]." (Tr. 231).

6

John David Lynch, M.D. began treating Myers in September 2007 and continued treating him through 2011. (Tr. 436-87, 514-31). Dr. Lynch treated Myers' low-back pain with various medications (Duralgesic Patch, Percoset, and Neurontin) and a TENS unit (in March 2010). Although Dr. Lynch's treatment records are many, Dr. Lynch did not provide a report containing his opinions about Myers' abilities to perform work activities.

**2.**
**Nontreating Physicians**

In April 2004, Aivars Vitols, D.O. examined Myers at the request of the Ohio Bureau of Disability Determinations. Dr. Vitols observed that Myers' gait was antalgic, favoring the lower left leg, and he noted that Myers "walks slightly forward flexed." (Tr. 154). Dr. Vitols further observed:

> Severe myospasm is present through the dorsolumbar paravertebral musculature, right and left. The left SI [sacroiliac] joint is very tender to palpation. There is no pain reported on the right. [Myers] has significantly restricted range of motion in all planes of the lumbar spine. [He] has no ability to extend the spine and all motion is reported with significant back pain. [He] is unable to perform heel-to-toe walking and cannot bear weight independently on either lower extremity.
>
> With [Myers] seated on the examining table, hip motion is unrestricted, right and left. Faber Patrick is negative. Straight-leg raising is positive at 75°, right and left.

(Tr. 155). Range of motion testing by Dr. Vitols showed that Meyers' dorsolumbar spine was limited to 40° flexion (90° is normal); 0° extension (30° is normal); 10° right-lateral flexion (30° is normal); and 15° left-lateral flexion (30° is normal). (Tr. 159).

Dr. Vitols' diagnostic impressions were (1) post laminectomy syndrome, (2)

degenerative disc disease, and (3) hypertension uncontrolled. Dr. Vitols noted in summary, "The claimant has severe spasm, restricted motion and pain in the low back...." (Tr. 156). He provided no specific opinion about Myers' work abilities. (Tr. 156).

In May 2004, Augusto L. Pangalangan, M.D. reviewed Myers' records and completed a form, assessing his physical residual functional capacity. (Tr. 161-65). Dr. Pangalangan opined that Myers could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. (Tr. 162). Dr. Pangalangan noted, "40 year old claimant alleges back pain with leg and muscle spasm with arthritis. He has had laminectomy in past. Current exam shows normal muscle strength and reflexes and evidence of myospasm and limited [range of motion]. There was no sensory deficits noted." *Id*.

In August 2004, Willa L. Caldwell, MD affirmed Dr. Pangalangan's opinion without providing any written explanation for her agreement. (Tr. 165).

In May 2006, Ron M. Koppenhoefer, M.D., examined Myers for the Ohio Bureau of Disability Determinations. Dr. Koppenhoefer's exam revealed:

> [Myers'] gait for distances observed in the office was abnormal. He used a cane in his left hand when his left leg was in stance phase. This necessitated a short stride length involving his left leg. Examination of spine revealed normal alignment. Percussion and palpation revealed tightness involving the lumbar paraspinal musculature. Generalized discomfort was noted upon palpation. Motion involving the lumbosacral spine was limited on all planes secondary to pain on active basis.... Straight leg raising in the sitting position caused back pain at 80° bilaterally. in the supine position the right leg caused pain at 40°, left 20°....

(Tr. 242). Dr. Koppenhoefer noted that although Myers had recently undergone diagnostic

tests but the results were not available for review. (Tr. 243). He then wrote, "Review of these would be indicated to make sure that the ability to do work related activities form is filled out properly. Without review if these anatomical studies[,] which were done at Miami Valley Hospital, [o]ne would have to indicate that he's significantly limited based on his subjective complaints of pain.... (Tr. 243).

In September 2006, Dr. Koppenhoefer provided his opinions about Myers' ability to do work-related activity. Dr. Koppenhoefer believed that Myers could perform light exertional work, lifting 20 pounds occasionally and less than 10 pounds frequently. (Tr. 304). Dr. Koppenhoefer also thought Myers could stand and/or walk about 6 hours in an 8-hour workday and sit less than 6 hours in an 8-hour workday. (Tr. 304-05).

## IV.  ALJ Lombardo's Sequential Evaluation

ALJ Lombardo resolved Myers' disability claim by using the five-Step sequential evaluation procedure required by Social Security Regulations. *See* Tr. 371-81; *see also* 20 C.F.R. § 404.1520(a)(4).  Her pertinent findings began at Step 2 where she concluded that Myers' severe impairments included lumbar degenerative disc disease and "the residual effects of lumbar surgery." (Tr. 373) (citations omitted)

The ALJ concluded at Step 3 that Myers did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner Listing of Impairments. (Tr. 375).

At Step 4, the ALJ concluded that Myers retained the residual functional capacity[4] to perform sedentary work with the following restrictions: "He must be able to change positions briefly between sitting and standing positions at 30 minute intervals, and he is restricted to occasional stooping and crouching." (Tr. 375).

The ALJ further found at Step 4 that Myers could not engage in his past relevant work and that his allegations of disabling pain lack credibility.

At Step 5, the ALJ concluded that Myers could perform a significant number of jobs in the national economy, including dowel inspector, clip loading machine feeder, and automatic grinding machine operator. (Tr. 380-81).

The ALJ's findings throughout his sequential evaluation led her to ultimately conclude that Myers was not under a disability and was therefore not eligible for DIB or SSI.

## V. __Discussion__

### A. __Judicial Review__

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

The substantial-evidence review does not ask whether the Court agrees or

---

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing the ALJ's legal criteria for correctness – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

### B.     Medical Source Opinions

Myers contends that ALJ Lombardo erred in rejecting the opinion provided by his long-term treating physician, Dr. Venable. Myers asserts that the ALJ did not rely on any

11

medical source opinion in support of her assessment of Myers' residual functional capacity, and that she gave no reason for rejecting Dr. Koppenhoefer's opinion about Myers' postural restrictions. Myers also contends that the ALJ erred by relying on the opinions of non-examining state-agency physicians because Dr. Pangalandan reviewed only 3 exhibits and Dr. Caldwell reviewed only 1 additional exhibit.

The Commissioner contends that substantial evidence supports the ALJ's assessment of Myers' residual functional capacity and the weight the ALJ gave to the medical source opinions. The Commissioner maintains that Dr. Venable's extremely restrictive assessment of Myers' residual functional capacity was at odds with the doctor's own prior clinical records "showing light duty work release and improvement in his condition (Tr. 180)." (Doc. #9, PageID at 84). And the Commissioner points out that the ALJ was persuaded by evidence showing normal objective back findings, in particular, normal neurological functionings, such as normal sensory responses, reflexes, motor strength, and straight leg raising tests (Tr. 376, referring to Tr. 154-55, 174, 242)." (Doc. #9, PageID at 84).

Social security regulations recognize several different categories of medical sources: treating physicians and psychologists, nontreating yet examining physicians and psychologists, and nontreating yet record-reviewing physicians and psychologists. *Gayheart*, 710 F.3d at 375.

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant

12

but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1)).

A treating source's opinion may be given controlling weight under the treating-physician rule only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Id*. at 376 (citing 20 C.F.R. §404.1527(c)(2)). "If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

Unlike treating physicians, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Other facts 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id*. (citing 20 C.F.R. §404.1527(c)(6)).

ALJ Lombardo rejected Dr. Venable's opinions because (1) he is not an orthopedist, (2) "his records seem to document very inconsistent clinical examinations that revealed little in the way of objective findings, and the opinions relied greatly on the claimant's subjective

allegations." (Tr. 379). ALJ Lombardo also noted that Dr. Venable did not indicate in his records that he advised Myers to stop working, and Dr. Venable "wrote many 'off work' notes for [Myers] due to a variety of ailments such as headaches, stress, fatigue, flu, and cough." *Id*. Lastly, the ALJ observed that Dr. Venable's opinion "is not echoed by the several specialists who have examined the claimant, nor by his current treating source." *Id*.

The ALJ correctly set forth the legal standards applicable under the treating physician rule, and the ALJ correctly recognized that when a the treating physician rule does not apply, the evaluation of the treating physician's opinion must continue to consider additional factors set forth in the Regulations. The ALJ then correctly identified these factors.  *See* Tr. 379; *see also Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 242.

But, rather than first discussing why the treating physician rule does not apply to Dr. Venable's opinion, the ALJ's first reason for rejecting Dr. Venable's opinion is that he is not an orthopedist. (Tr. 379). This application of the "specialization" factor as the <u>first</u> reason for rejecting Dr. Venable's opinion fails to follow the mandatory procedure set forth in the regulations and case law. As noted above, the regulations require ALJs to first evaluate whether the treating physician rule applies under the well-known standards set forth in 20 C.F.R. §404.1527(c)(2). If the ALJ finds the rule inapplicable, only then do the Regulations instruct ALJs to consider "specialization" and the remaining regulatory factors. *See* 20 C.F.R. §404.1527(c)(2)-(6). By jumping first to the "specialization" factor, the ALJ not only failed to provide good reasons for not applying the treating physician rule to Dr. Venable's opinions, the ALJ's analysis failed to reflect the rebuttable presumption applicable to Dr.

14

Venable's opinion. "[I]n all cases, there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242 (citing and quoting parenthetically, Social Sec. Ruling 96-2p, 1996 WL 374188, at *4 ("In many cases, a treating physician's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

The Commissioner contends that the ALJ rejected Dr. Venable's opinion that Myers could not perform sedentary work because that opinion "was at odds with the doctor's own earlier clinical records showing a light duty work release and improvement in his condition." (Doc. #9, PageID at 84). Through this argument, the Commissioner correctly observes that the ALJ rejected Dr. Venable's opinion for more reasons than his lack of specialization. Yet, substantial evidence does not support the ALJ's additional reasons, beginning with the ALJ's reliance on the purported lack of objective evidence supporting Dr. Venable's opinion. Dr. Venable's treatment records identify objective evidence that supports his opinion. Social Security regulations define "objective medical evidence" to consist of both "medical signs and laboratory findings ...." 20 C.F.R. §404.1529(a). Medical "signs are anatomical, physiological, or psychologic abnormalities which can be observed, apart from [a claimant's] statements (symptoms), signs must be shown by medically acceptable clinical diagnostic techniques...." 20 C.F.R. 404.1528(b). Dr. Venable identifies specific medical signs based on the results of his examinations of Myers. On many occasions, Dr. Venable observed that Myers had an antalgic gait, significantly reduced range of motion, muscle

15

spasms, positive straight-leg-raising tests, swelling and tenderness in his lumbar or lumbosacral region, diminished reflex in his left Achilles tendon, left-leg numbness, decreased lordosis, and decreased sensation. (Tr. 167, 169, 174, 183, 194, 196, 210, 214, 217, 249-250, 253, 260, 274, 299, 431, 435, 438, 489, 502, 508).

The ALJ also rejected Dr. Venable's opinion by speculating that he "relied greatly on the claimant's subjective allegations." (Tr. 379). Substantial evidence does not support this reason because Dr. Venable's treatment records show that he examined Myers on many occasions and often noted the medical signs – identified in the previous paragraph – that are consistent with his opinion. *Cf.* Soc. Sec. Ruling 96-7p, 1996 WL 374186 ("The examples in the regulations (reduced joint motion, muscle spasms, sensory deficit, and motor disruption) illustrate findings that may result from, or be associated with, the symptoms of pain. When present, these findings tend to lend credibility to an individual's allegations about pain and their functional effects."). Consequently, Dr. Venable's treatment records demonstrate time and again that he did more than merely accept Myers' subjective descriptions of his pain; over the years, he frequently performed clinical exams and tests that led him to accept Myers' reported pain levels.

The administrative record contains other objective evidence supporting Dr. Venable's opinion. Myers underwent an x-ray of his lumbar spine in April 2006. A physician, Dr. Voss, compared the April 2006 x-ray with the results of previous (February 2002) x-ray. Dr. Voss reported that Myers had a new or increased grade I spondylolisthesis of L4 on L5 as well as degenerative disc disease and facet arthropathy at this vertebral level. (Tr. 254). An

16

MRI in April 2006 revealed multilevel lumbar spondylosis, most severe at L4-5 and L5-S1. (Tr. 256). Specifically, the degenerative changes at L4-5 created moderate to severe left and severe right neural foraminal narrowing with bilateral L4 nerve root abutment and deformity noted on the right. *Id*. At L5-S1, the degenerative changes created moderate to severe right and severe left foraminal narrowing. *Id*. The bulge at this level appeared to "abut and likely deform the left S1 nerve root." (Tr. 256).

The Commissioner contends that the "ALJ was also persuaded by evidence showing normal objective back findings, in particular, normal neurological functioning, such as normal sensory responses, reflexes, motor strength, and straight leg raising tests. (Tr. 376, referring to evidence at Tr. 154-55, 174, 242)." (Doc. #9, PageID at 84). However, considering all of Myers' medical records, the presence of some normal test results does not show that substantial evidence supported the ALJ's rejection of Dr. Venable's opinion. The Commissioner first relies on two pages of Dr. Vitols' report, specifically transcript pages 154-55. On those pages, Dr. Vitols indeed found normal objective findings in areas other than Myers' lumbar spine. He, for example, noted that Myers' "[c]ervical spine reveals full range of motion. There is no palpable myospasm, right or left. There are no areas of tenderness to palpation. Compression test and Tinel's are negative throughout the cervical spine." (Tr. 154). Yet, Myers' disabling pain is due to objectively verified problems in his lumbar or lumbosacral region. It is therefore necessary to examine the next page of Dr. Vitols' report (Tr. 155) where he identified objective findings in Myers' lumbar spine. Dr. Vitols wrote:

> Severe myospasm is present through the dorsolumbar paravertebral musculature, right and left. The left SI joint is very tender to palpation. There is no pain reported on the right. Claimant has significantly restricted range of motion in all planes of the lumbar spine. The claimant has no ability to extend the spine and all motion is reported with significant back pain. Claimant is unable to perform heel-to-toe walking and cannot bear weight independently on either lower extremity.

(Tr. 155). Dr. Vitols also reported that on the straight-leg-raising test, Myers was positive at 75°, right and left. *Id*. Because these objective findings by Dr. Vitols concerning Myers' lumbar spine tend to support Dr. Venable's opinion, it is simply irrelevant that Dr. Vitols identified normal objective findings in Myers' cervical spine or other areas of his body.

For these same reasons, transcript page 242 does not assist the Commissioner. Page 242 documents the results of Dr. Koppenhoefer's examination of Myers. Rather than normal objective findings in Myers' lumbar spine, Dr. Koppenhoefer found abnormalities similar to those identified by Dr. Vitols. (Tr. 155, 242). Consequently, because Dr. Koppenhoefer's findings as to Myers' lumbar spine tend to support Dr. Venable's opinion, it is simply irrelevant that Dr. Koppenhoefer also identified normal objective findings. *Id*.

Transcript page 174 fares no better. Although Dr. Venable wrote at Tr. 174 that straight-leg-raising was negative, he also found that Myers had tenderness and spasm in his lumbar paraspinal muscles, limited range of motion in his lumbosacral spine, and soft tissue swelling in his lower lumbar region. Given these findings along with other instances when straight-leg-raising was positive, this incidence of a negative straight-leg-raising test does not show any meaningful inconsistency between Dr. Venable's treatment records and his opinion.

This leaves the ALJ's reliance on the state-agency physicians, Dr. Pangalangan and Caldwell. The ALJ, however, merely accepted their opinions in a conclusory manner without weighing them under the factors required by the regulations and case law. The Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(c) including, at a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. §404.1527(e); *see also* Social Sec. Ruling 96-6p, 1996 WL 374180, at *2-*3. "To be sure, a properly balanced analysis might allow the Commissioner to ultimately defer more to the opinions of consultative doctors than those of treating physicians. But the regulations do not allow the application of greater scrutiny to a treating-source opinion as a means to justify giving such opinion little weight. Indeed, they require just the opposite." *Gayheart*, 710 F.3d at 379-80. In the present case, the ALJ erred in precisely this way by crediting the opinions of the record reviewers – Drs. Pangalandan or Caldwell – without applying any of the regulatory factors, yet rejecting Dr. Venable's treating-physician opinion after subjecting it to greater scrutiny.  As in *Gayheart*, this approach is opposite to the regulatory-required weighing of treating versus non-treating physicians' opinions that the regulations require. *See id*.

Accordingly, Myers' challenges to the ALJ's rejection of his treating-physician's opinion is well taken.[5]

---

[5] In light of the above review, and the resulting need for remand of this case, an analysis of the parties' remaining arguments, including those focusing on the ALJ's assessment of Myers' credibility, is unwarranted.

## VI.    <u>Reversal and Remand for Benefits</u>

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A reversal of the ALJ's decision and a judicial award of benefits is warranted in the present case, because the evidence of disability is strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. The objective medical evidence and Dr. Venable's treatment records and findings and the many similar findings by Drs. Vitols and Koppenhoefer are refuted in the main only by two record-reviewing physicians, only one of whom (Dr. Pangalandan) provided any explanation for his opinion. There is also no dispute in the record that Dr. Venable was Myers' long-term treating physician, beginning in 1987. The longitudinal medical record demonstrates that Myers sought and obtained many treatment modalities in an attempt to alleviate his low-back pain. He had two back surgeries in the distant past and to his credit he maintained employment for approximately 13 years after those surgeries. The record shows that over time and with additional injuries, Myers' low-

20

back pain increased to the point where he was repeatedly hospitalized. The record further indicates that physicians, including Dr. Venable, have taken his pain complaints seriously and have attempted over many years with to determine the most efficacious treatment, prescribing a variety of strong narcotics, physical therapy, steroid injections, Duralgesic patch, and a TENS unit. *E.g.,* Tr. 116-122, 152, 177, 179, 192, 197, 248, 289-93, 299, 438-87, 514-31. Considering the extensive record of medical evidence, including the credible and controlling findings and opinions of long-term treating physician Dr. Venable, along with the twice-repeated absence of proper analysis by the ALJs assigned to Myers' applications, an Order remanding this case for benefits is warranted. *See Faucher*, 17 F.3d at 176; *see also Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994).

## IT THEREFORE IS RECOMMENDED THAT:

1.  The Commissioner's final non-disability decision be reversed;

2.  Plaintiff John Myers' case be REMANDED to the Social Security Administration for payment of benefits consistent with the Social Security Act; and

3.  The case be terminated on the docket of this Court.


July 16, 2013

                               _____s/Sharon L. Ovington_____
                                    Sharon L. Ovington
                                Chief United States Magistrate Judge

21

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).